NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SANFORD P. JAMES,** | |
| Plaintiff-Appellant, | Civil Action No. 14-CV-4218(FLW) |
| v. | |
| **COMMISSIONER OF SOCIAL SECURITY,** | **OPINION** |
| Defendant-Appellee. | |

Sanford P. James ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act ("SSA"). Plaintiff contends that the record does not support the decision made by the Administrative Law Judge ("ALJ"). Specifically, Plaintiff argues that the ALJ improperly assessed the evidence as to Plaintiff's severe impairments and that Defendant failed to meet its burden at Step Five. After reviewing the Administrative Record, the Court finds that the ALJ's opinion was based on substantial evidence and accordingly, affirms the decision.

I.      **Factual Background and Procedural History**

Plaintiff was born on October 3, 1971, and was 38 years old on the alleged disability date of April 30, 2010. Administrative Record ("A.R.") 190. Plaintiff has some college education, and is able to communicate in English. A.R. 60. Plaintiff has worked various jobs in a number of fields including security, maintenance, housekeeping, manual labor/moving, and driving/delivery. *See* A.R. 222–31. Although unable to provide much detail as to specific

1

employment dates or job duties, Plaintiff described having worked for Route One Auto Rental, Premiere Security, Allied Barton, and Central Jewish Nursing. A.R. 222–28. Additionally, Plaintiff worked for Robert Wood Johnson Hospital as a housekeeper and custodian; Quality Insulation, where he was responsible for lifting bags of insulation material; College Grads, where he lifted and transported furniture; and Office Express, where he provided delivery services. *Id.* Prior to the alleged disability date, Plaintiff was awarded Social Security disability benefits for a closed period from December of 2007 to January of 2009. A.R. 60. At the conclusion of the disability period, Plaintiff worked for Edison Job Corps from January 12, 2009 to May 4, 2010 and performed facility/building maintenance, including "groundwork, landscaping, and yard work." A.R. 60–61, 230.

According to Plaintiff, the collective effects of his conditions forced him to stop working. A.R. 233. According to Plaintiff, his conditions include: asthma, for which he is prescribed medication, A.R. 41–42, 603; sleep apnea, for which he was prescribed a contiguous positive airway pressure ("CPAP") machine, A.R. 44, 71; diabetes and obesity, for which he is prescribed insulin and other medications, A.R. 37–38; neuropathy in his right foot and leg, and right pinkie and ring finger, which Plaintiff believes to be complications from the diabetes, A.R. 39–40; back pain, for which he has received treatment, A.R. 40–41; deafness in his right ear, A.R. 43; and psychological symptoms, including feelings of anxiety and depression. A.R. 365, 369.

Plaintiff applied for Social Security Disability Insurance Benefits ("SSDIB") on July 29, 2010, alleging disability as of April 30, 2010. A.R. 190–92, 233. The application was initially denied on December 1, 2010; reconsideration of the application was denied on March 24, 2011. A.R. 103–05, 108–10. Plaintiff, who is represented in this matter by counsel, requested a hearing in front of an ALJ, and testified before ALJ Dennis O'Leary on March 1, 2012. A.R. 56–76. On

2

May 7, 2012, the ALJ issued a written decision in which he concluded that Plaintiff was not entitled to disability benefits. A.R. 79–95. Plaintiff sought review of this decision by the Appeals Council, and on July 24, 2013, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded for further consideration. A.R. 96–100. Pursuant to the Appeals Council's Order, the matter was heard *de novo* at a hearing held on November 8, 2013. A.R. 30–55. In a decision dated January 10, 2014, the ALJ found that Plaintiff failed to prove he was disabled. A.R. 10–29. Thereafter, Plaintiff appealed the ALJ's 2014 decision to the Appellate Council which, on May 27, 2014, affirmed. A.R. 1–6. On July 2, 2014, Plaintiff filed the present appeal.

**a.      Review of the Medical Evidence**

**i.        Robert Wood Johnson Emergency Room Medical Records**

Between 2008 and 2010, Plaintiff made a considerable number of visits to the emergency room, which I will briefly summarize.

- On March 15, 2008, Plaintiff presented with shortness of breath and was treated with Albuterol. A.R. 311–13. The attending physician noted that Plaintiff reported smoking. *Id.*

- On May 28, 2008, Plaintiff went to Robert Wood Johnson Hospital ("RWJ") complaining of shortness of breath, and was treated with Albuterol and Prednisone. A.R. 296–97.

- On June 15, 2008, Plaintiff was admitted and treated for asthma and low blood sugar. A.R. 340.

- On July 1, 2008, Plaintiff visited RWJ with high blood sugar, complaints of abdominal pain, urinary pain, and generalized weakness. A.R. 287–88. Plaintiff was provided with insulin and thereafter signed out against medical advice ("AMA"). A.R. 290–91.

- On July 24, 2008, Plaintiff visited RWJ with shortness of breath, was treated with Combivent and Prednisone, and was prescribed additional medication to take at home. A.R. 293–94.

- On October 20, 2008 and November 3, 2008, Plaintiff presented with shortness of breath and was treated with Albuterol. A.R. 305–06, 308–09.

- On November 29, 2008, Plaintiff complained of chest pain and received a prescription for Albuterol. A.R. 316–17.

- On February 9, 2009, Plaintiff presented with a cough and low back pain that was exacerbated by coughing, for which he was prescribed Percocet and Albuterol. A.R. 336–37.

- On October 13, 2009, Plaintiff complained of leg pain stemming from an incident at work. A.R. 353.

- On July 5, 2009, Plaintiff presented with back pain. A.R. 359.

- On July 13, 2009, Plaintiff visited RWJ complaining of hyperglycemia and its accompanying side effects. A.R. 355.

- On November 2, 2010, Plaintiff presented with hyperglycemia and was found to be in stable condition. Plaintiff was admitted, and a battery of tests were conducted. A.R. 423–42. In addition to receiving treatment for his elevated blood sugar level, Plaintiff was diagnosed with an infection in his mouth, and had a tooth removed. A.R. 439.

ii.     **Dr. Alina Tyndall, MD — Plaintiff's Primary Care/Personal Physician**

Dr. Tyndall met with Plaintiff several times during the pertinent time frame. On May 10, 2010, Dr. Tyndall saw Plaintiff for a follow up to a recent emergency room visit. A.R. 365. Plaintiff reported difficulty sleeping, depression, and a "popping" in his left knee. *Id.* Plaintiff

4

informed Dr. Tyndall that he was eating a healthier diet and had lost 20 pounds. *Id.* Dr. Tyndall noted that Plaintiff was using an inhaler 4–5 times per week, although the doctor was "unsure if it is asthma vs anxiety symptoms." *Id.* Dr. Tyndall found that Plaintiff was suffering from anxiety and depression, and started him on Xanax. A.R. 367. Additionally, Dr. Tyndall found that Plaintiff's diabetes was not under control, and instructed him to continue taking the prescribed medication and contact his endocrinologist. *Id.*

Nine days later on May 19, Plaintiff returned to Dr. Tyndall complaining of anxiety and flu-like symptoms. A.R. 369. During that visit, Plaintiff informed the doctor that he powerwalked over an hour per week and exercised for 30 minutes, five times per week. A.R. 370. Dr. Tyndall noted Plaintiff's complaint of bilateral leg pain, and speculated that the etiology may be neuropathy. A.R. 371.

In addition to conducting physical examinations of the Plaintiff, Dr. Tyndall completed a mental impairment evaluation assessing Plaintiff's status, dated June 14, 2010. A.R. 374, 381. Dr. Tyndall evaluated Plaintiff as suffering from depression, anxiety, lower back pain, asthma, diabetes, and peripheral neuropathy. A.R. 374–81.

### iii.        Dr. Rey T. Villanobos, MD — Treating Endocrinologist

Dr. Villanobos began seeing Plaintiff on July 27, 2009, and reported continuous visits on a monthly basis. A.R. 384. Several weeks later on August 10, 2009 and August 21, 2009, the doctor found that Plaintiff's condition had not substantially changed. A.R. 412–13.

Dr. Villanobos again examined Plaintiff on March 1, 2010, and determined that he was suffering from poorly controlled diabetes and asthma. A.R. 411. Additionally, Plaintiff was noted to have smoked three cigarettes per day. *Id.*

5

On May 6, 2010, May 20, 2010, and June 3, 2010, Dr. Villanobos found Plaintiff's blood sugars again elevated, and noted that the diabetic neuropathy was persisting. A.R. 404, 406.

On August 26, 2010, Dr. Villanobos found that Plaintiff failed to follow instructions regarding checking his blood sugar and taking his medications, and that his blood sugar and weight had both increased since his previous visit. A.R. 387. Additionally, Dr. Villanobos opined that Plaintiff could lift, carry, push or pull objects up to 20 pounds in weight, and can stand and/or walk for up to two hours per day. A.R. 385. Furthermore, Dr. Villanobos noted that Plaintiff's asthma, diabetes, and neuropathy might limit his ability to perform certain work related duties. *Id.*

Dr. Villanobos again saw Plaintiff on September 27, 2010, and noted that Plaintiff's weight and blood sugar levels were again elevated. A.R. 398. Plaintiff also complained of leg pain, and was told to visit with a neurologist. *Id.*

iv.     **Dr. Mark A. Jacknin, D.O. — Physical Residual Functional Capacity Assessment**

On August 26, 2010, Dr. Jacknin evaluated Plaintiff for the purposes of completing a Physical Residual Functional Capacity ("RFC") Assessment. Dr. Jacknin concluded that Plaintiff could occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry 25 pounds, sit and/or stand for about six hours in an eight-hour workday, and had limited lower extremity usage due to mild neuropathy. A.R. 391.

v.     **Dr. Michael Brustein, Psy.D.**

Dr. Brustein examined Plaintiff on October 23, 2010 and evaluated Plaintiff in accord with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), ultimately concluding that Plaintiff suffered from Major Depressive Disorder and Panic Attack Disorder. A.R. 420–21.

6

Dr. Brustein opined that Plaintiff had an adequate recent memory, could understand directions, and had only mildly impaired concentration. A.R. 421.

### vi.        Dr. Sharon Flaherty, Ph.D. — Psychiatric Review — State Agency

Dr. Flaherty conducted a full mental status examination of Plaintiff on November 9, 2010. A.R. 443. Dr. Flaherty determined that Plaintiff suffered from Affective Disorders, specifically Depressive Syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, and pervasive loss of interest in almost all activities. A.R. 446. Dr. Flaherty ultimately concluded that the symptoms did not result in a degree of limitation that satisfied the functional criterion. A.R. 453, 457–59. Specifically, Dr. Flaherty found that Plaintiff "retains the mental ability to understand, remember and follow instructions and complete routine tasks in a lower stress setting with minimal interpersonal contact." A.R. 459.

### vii.        RWJMG — Family Medicine at Monument Square

Included in the record are Plaintiff's medical records from RWJMG for the period of 2005–2011. Throughout that time, Plaintiff presented with a number of consistent complaints. Among them, Plaintiff presented with consistent obesity, at times exceeding 300 pounds. A.R. 467, 477, 480. Similarly, Plaintiff presented with uncontrolled diabetes. A.R. 468, 470, 473, 480, 509, 517, 521, 540, 548, 563, 571, 586, 599, 607. Plaintiff also suffered from asthma, for which treatment was provided. A.R. 468, 470–71, 473, 477, 480, 483, 502, 509, 513, 517, 522, 563, 571, 587, 598, 607. At times, Plaintiff would complain of back pain. A.R. 477, 480, 485–86, 498–99, 541, 548. Plaintiff also noted leg and foot pain on a less regular basis, with mixed possible etiology, although neuropathy had been offered as a possible root cause. A.R. 489–90, 540, 548, 553. Plaintiff also presented with depression and anxiety. A.R. 521, 538, 540, 548.

7

The record indicates that Plaintiff engaged in regular physical activity, powerwalking for at least an hour per day, and exercising for 30 minutes, five days per week. A.R. 512.

### viii.  Dr. John Hester, MD — Examination Report

Dr. Hester examined Plaintiff on May 26, 2011, and concluded that he could not work. A.R. 619–20. Dr. Hester determined that the disability precluded work for more than 12 months, and suggested that surgery be explored as a possible treatment option for Plaintiff's nerve pain. A.R. 620. No further explanation was provided for these findings. *See id.*

### ix.  Polysomnography/Sleep Study Report

On January 2, 2012, Plaintiff underwent a sleep study conducted by the Robert Wood Johnson Sleep Center. A.R. 635–38. Plaintiff was found to suffer from moderately severe sleep-disordered breathing that resulted in severe disruption of sleep. A.R. 637. A new sleep study with a CPAP machine was suggested. *Id.*

### x.  RWJ University Hospital — Department of Clinical Neurophysiology

On March 12, 2012, Plaintiff underwent a battery of nerve conduction studies on his lower extremities. A.R. 639–40. Dr. Chen, MD, Ph.D., who reviewed the results of that test, also concluded that Plaintiff suffered from "very mild axonal polyneuropathy affecting his lower extremities. . . ." A.R. 640.

### xi.  Dr. Irving Kaufman, MD — Examination Report

On February 11, of what appears to be the year 2013, although the date on the report is illegible, Dr. Kaufman completed an examination report and employment evaluation of Plaintiff. A.R. 647. Dr. Kaufman noted Plaintiff's diagnoses of asthma, diabetes, anxiety, neuropathy of the foot and leg, and sleep apnea. *Id.* Furthermore, Dr. Kaufman recognized that Plaintiff was diagnosed with Anxiety Disorder in 2011. *Id.* Based upon these findings, Dr. Kaufman

concluded that Plaintiff was unable to work for at least 12 months, finding that Plaintiff was a likely candidate for SSI until February 11, 2016. A.R. 648.

     **xii.**     **RWJ Medical School — New Jersey Pain Institute**

On September 17, 2013, Plaintiff was examined by the New Jersey Pain Institute after presenting with pain in his foot and lower back. A.R. 662. Plaintiff was diagnosed with a herniated disk. *Id.*

**b.**     **Review of Testimonial Record**

     **i.**     **Plaintiff's Testimony**

Plaintiff gave testimony on two occasions in the matter. On March 1, 2012, Plaintiff testified at a hearing before ALJ Dennis O'Leary. A.R. 56–76. Following Plaintiff's successful appeal of the ALJ's initial decision denying him benefits, on remand from the Appeals Council, on November 8, 2013, Plaintiff again testified before ALJ O'Leary. A.R. 30–55. Because the case was remanded for further consideration of the first hearing, and all testimony in the second hearing relates to the same information discussed in the prior hearing, the information from the two testimonial hearings will be presented together.

Plaintiff began his testimony by discussing his background, noting that he was 40 years old, and had completed some college education. A.R. 60. Plaintiff stated that he lived with his wife and five children and that his wife helped take care of him. A.R. 45, 48. Plaintiff acknowledged that he was previously awarded Social Security Disability benefits for a closed period from December 2007 through January 2009, and, at the conclusion of that period, re-entered the work force, taking a position with Edison Job Corps in facility maintenance. A.R. 60–61, 35, 45. Plaintiff worked there for two years until being terminated. *Id.* Plaintiff undertook similar duties for Robert Wood Johnson while he was employed there for approximately three

months. A.R. 35. Additionally, Plaintiff testified that he worked in food services for a Rutgers

dining hall from November 1995 to April 2004. A.R. 35–36.

Thereafter, Plaintiff was asked about his diabetes and sugar levels. A.R. 62. Plaintiff

testified that he checked his sugars three times per day, and noted that the results were "never

normal." A.R. 62, 74, 37. Specifically, Plaintiff said that a typical reading was somewhere

between 450 and 500, and that his doctor had been advising him to increase his insulin usage as

necessary. A.R. 37.For his diabetes, Plaintiff took Lantus, NovoLog, and Metformin on a regular

basis. A.R. 62–63, 38. When asked about his height and weight, Plaintiff said that he was 5'11,

274 pounds, but noted that he had weighed over 300 pounds at one point. A.R. 63, 45. Plaintiff

testified to not smoking cigarettes, and seeing his doctor on a regular basis. A.R. 75, 49.

Additionally, as complications of his diabetes, Plaintiff testified that he suffered from

numbness in his right foot and leg, and his left pinkie. A.R. 66, 39. Plaintiff also noted that he

underwent an EMG test, through which it was determined that the cause of the numbness was

likely neuropathy. *Id.* Plaintiff also stated that because of his diabetes, he developed vision

problems resulting in his inability to consistently operate a vehicle. A.R. 40, 47. Additional side

effects from his diabetes included consuming a lot of water, urinating often, and having an off

taste or scent in his mouth. A.R. 65, 38.

Plaintiff noted seeing an endocrinologist, Dr. Villalobos, for quite some time, but stated

that his primary care physician had recently referred him to a new endocrinologist. A.R. 67.

Plaintiff also testified about his life-long struggle with asthma. A.R. 42. Plaintiff kept a

nebulizer near his bed and claimed to need treatments all day long. *Id.* Additionally, Plaintiff

took the medications ProAir, Ventolin, and Serevent. *Id.* Plaintiff also testified that he had been

"in and out of the hospital for all [his] life," including his most recent hospitalization for asthma

in 2011. A.R. 42. Plaintiff testified that his asthma was often triggered by smoke, dust, stress, and change of climate. A.R. 42–43.

Plaintiff also testified that he was prescribed the medications Tramadol, Diclofensie, Flexeril, as well as Hydrocortisone for pains in his back, right foot, and knee. A.R. 67–68, 40, 43. Plaintiff stated that these medications provided only slight relief. A.R. 43. For his pain, Plaintiff spoke about visits with a pain management neurologist, and attending physical therapy sessions. A.R. 68, 40. In describing his back pain, Plaintiff stated, "I feel like I got a clamp on my back that's squeezing my spine." A.R. 41. Plaintiff noted having pain while walking, specifically articulating that his leg began burning, feeling like "it's on fire inside," and his knee would sometimes "lock up." A.R. 69, 39. Plaintiff claimed that standing for a period of five minutes would also result in the same burning sensation and a "shooting pain" in his right knee. *Id.* Plaintiff testified about having trouble remaining seated, but noted that if he held his leg straight out while massaging the area suffering from the burning sensation, he could remain seated for up to 45 minutes. A.R. 70, 41. Furthermore, Plaintiff noted that he has to "almost pry open" his right hand when he's holding an object for an extended period. *Id.*

Plaintiff testified that he used a CPAP machine, and claimed that he was unable to sleep through the night without it. *Id.* Plaintiff stated that the neuropathy also affected his ability to sleep. A.R. 71, 44.

Asked about his daily activities, Plaintiff testified about helping his wife with chores around the house and raising their three-year-old baby. *Id.* Plaintiff claimed to be able to sweep, wash dishes, and occasionally cook. *Id.* Plaintiff stated that he was able to shower and put on his shirt, but needed assistance with his socks and tying his shoes. A.R. 46.

Plaintiff also testified that he had been deaf in his right ear since the age of seven, A.R.43, and that his medical conditions affected his ability to complete his job as a forklift driver. A.R. 73.

Plaintiff was questioned by the ALJ about his pre-diabetic activities, to which he testified that he worked as a security guard at the Middlesex County Courthouse from January to July of 2007. A.R. 73, 36. Plaintiff stated that on Father's Day 2008, he was hospitalized for his diabetes. *Id.*

### ii. Vocational Expert — Pat Green

Vocational expert Pat Green testified at the second hearing on November 8, 2013, and was examined by the ALJ regarding Plaintiff's work capabilities. A.R. 50–54. The vocational expert outlined Plaintiff's vocational history as: Janitor, DOT 382.664, SVP 3, and Sales Route Driver, DOT 292.353-010, SVP 3. A.R. 51.

The ALJ then asked the expert to assume an individual of Plaintiff's age, education, and work history, who is restricted to sedentary work, cannot perform fine fingering with the pinkie and ring finger on the right hand, and asked the expert to assume that the individual cannot work in an environment with "undue concentrations of dust, smoke, fumes, or other pulmonary irritants or extremes of temperatures." A.R. 52. Furthermore, the ALJ asked the expert to assume that the individual would be restricted to simple, repetitive jobs with one or two-step processes to completion, and that the individual is deaf in one ear. The expert then testified that such a person could perform the following jobs:

- Order Clerk, DOT # 209.567–014, SVP of 2—unskilled, sedentary work, of which there were 2,000 jobs in the region, and 45,000 jobs in the national economy; A.R. 52.

- Toy Stuffer, DOT # 731.685–014, SVP of 2—unskilled, sedentary work, of which there were 2,350 jobs in the region and 200,000 in the national economy; A.R. 53.

- Sorter, DOT # 521.687–086, SVP of 2—unskilled, sedentary work, of which there were 2,000 jobs in the region, and 345,000 jobs in the national economy. *Id.*

## c.   ALJ's Findings

### i.  Initial Hearing — March 1, 2012

The ALJ began by finding that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. A.R. 84. Next, the ALJ applied the standard five-step process to determine whether Plaintiff had satisfied his burden of establishing disability. *Id.* First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 30, 2010, the alleged onset date. *Id.* Second, the ALJ determined that Plaintiff had the following severe impairments: diabetes with mild sensory deficits of the bilateral feet, asthma, sleep apnea, and obesity. *Id.* The ALJ found that Plaintiff failed to establish that his depression was severe in nature. *Id.* The ALJ supported this finding by noting that Plaintiff had not been treated by a psychiatrist or psychologist, is consistently documented as being alert and oriented, and lacked a medical history involving depression. *Id.* The ALJ noted, however, that Plaintiff's primary care physician, Dr. Tyndall, completed a mental impairment form concluding that Plaintiff had a limitation on his social functioning that would preclude his employment. *Id.* The ALJ found this statement to lack credibility, determining that it was conclusive in nature, and unsupported by the weight of the evidence. *Id.*

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments under the Social Security Act ("SSA") that would qualify for disability benefits. A.R. 85. The ALJ

found that, although Plaintiff suffered from diabetes, he did not have severe neuropathy demonstrated by significant disorganization of motor function in two extremities. *Id.* The ALJ also considered Plaintiff's asthma, but found that Plaintiff did not establish the requisite number or frequency of attacks. *Id.*

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of sedentary work under the SSA, except that, due to his asthma, Plaintiff "should avoid temperature extremes, pulmonary irritants, work around dangerous machinery and heights." A.R. 86. The ALJ noted that while Plaintiff's complaints of a burning sensation in his legs and losing his balance, his asthma, diabetes, and related complications, may be true, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible. . . ." A.R. 87. The ALJ substantiated this conclusion by analyzing the medical evidence and noting that Plaintiff's diabetes was being medically treated, and that Plaintiff was non-compliant with his treatment regimen. A.R. 88. Similarly, the ALJ relied upon medical reports which indicated that while Plaintiff occasionally complained of knee and back pain, he "was often a 'no show'" for his medical appointments, and "frequently reported that he was not always taking his prescribed medications as recommended." *Id.* Furthermore, while the ALJ recognized that Plaintiff was diagnosed with mild peripheral neuropathy, he noted that Plaintiff was able to walk independently, and even reported to Dr. Tyndall that he "power walks for 1-1 ½ hours per day and he exercises for 30 minutes a day." *Id.* Regarding Plaintiff's asthma and sleep apnea, the ALJ noted that although Plaintiff received treatment for these conditions, he continued to smoke after being repeatedly urged to stop. *Id.*

The ALJ accorded little weight to Dr. Tyndall's reports concerning Plaintiff's condition "since it appears [they are] based on subjective complaints of pain and not on objective medical

evidence, and [are] not supported by the record as a whole." A.R. 89. Ultimately, the ALJ concluded that "[a]lthough the claimant has suffered from a medically determinable 'severe' impairment, the evidence establishes that the claimant has the capacity to function adequately to perform many basic activities associated with work." *Id.*

At the Fifth Step, the ALJ found that Plaintiff was unable to perform any past relevant work. A.R. 89–90. Notwithstanding, the ALJ concluded that, considering the "claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." A.R. 90. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the SSA, from April 30, 2010 through March 1, 2012, the date of the decision. A.R. 91.

### ii.   Order of Appeals Council — Granting Request for Review

On July 24, 2013, the Appeals Council granted Plaintiff's request for review of the May 7, 2012 decision finding him to not be suffering from a disability. A.R. 97–99. The Appeals Council vacated the hearing decision and remanded the case to the ALJ. A.R. 97.

The Appeals Council instructed the ALJ to review the determination that Plaintiff's depression was not a severe impairment. *Id.* Specifically, the ALJ was directed to review and discuss Dr. Shapiro's and Dr. Flaherty's (together the "State Agency psychiatrists") findings that Plaintiff's depression was in fact a severe impairment, and that Plaintiff retained the ability to understand, remember, and follow instructions to complete routine tasks in a lower stress setting. *Id.*; *see also* A.R. 615.

Second, regarding the ALJ's finding that Plaintiff had environmental limitations due to his medical conditions, the Appeals Council directed the ALJ to specify the degree to which the

15

claimant needs to avoid these environmental situations. *Id.* The Appeals Council found that "further evaluation of the claimant's residual functional capacity is necessary." *Id.*

Third, the Appeals Council found that the ALJ failed to evaluate Dr. Hester's opinion[1] that Plaintiff was unable to work from June 1, 2011 to May 30, 2012 due to his asthma, uncontrolled diabetes, and nerve damage. A.R. 98. Similarly, the Appeals Council found that the ALJ failed to evaluate and weigh the testimony offered by Plaintiff's fiancé, Amanda McDaniel, that Plaintiff could walk for a block or two before needing to rest. *Id.*

Lastly, the Appeals Council found that the ALJ's determination regarding Plaintiff's "disability" was lacking, and remanded for further consideration. *Id.*

The Appeals Council ordered that, upon remand, the ALJ should: obtain additional evidence concerning Plaintiff's impairment, further evaluate Plaintiff's mental impairment in accordance with 20 CFR 404.1520a, further consider Plaintiff's maximum residual functional capacity during the entire period at issue and provide rationale—with specific references to evidence in the record—to support the assessed limitations, evaluate lay witness testimony and explain the weight given to it, and obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. A.R. 98–99.

### iii.  Remand Hearing — November 8, 2013

On remand, the ALJ again found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. A.R. 15. Next, the ALJ applied the standard five-step process to determine whether Plaintiff had satisfied his burden of establishing disability. *Id.*

---

[1] The Administrative Record mistakes the opinion of Dr. Hester for the opinion of a "Dr. Heart," a mistake easily made due to the poor handwriting on the document. For Dr. Hester's report, see A.R. 619–20.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 30, 2010, the alleged onset date. *Id.*

Second, the ALJ determined that Plaintiff had the following severe impairments: diabetes and obesity. A.R. 16. The ALJ found that the evidence failed to establish severe impairment involving asthma, sleep apnea, and depression, as Plaintiff failed to show that these conditions had any greater than a slight or minimal effect on his ability to perform basic work activities. *Id.* The ALJ found that Plaintiff's asthma had been under control, a finding he supported by citing Plaintiff's lack of recent emergency room visits for this condition. *Id.* Furthermore, although the ALJ noted that Plaintiff did have a history of prior emergency room visits for "exacerbations of asthma," the ALJ acknowledged that Plaintiff continued to smoke cigarettes despite recommendations to stop. *Id.* Furthermore, the ALJ found Plaintiff's sleep apnea to be under control and acknowledged that Plaintiff was using a CPAP machine that provided relief. *Id.* As to Plaintiff's neuropathy, the ALJ found that Plaintiff suffered "mildly decreased sensation in his feet." *Id.* Notwithstanding, the ALJ found that Plaintiff's "gait is normal and he does not need an assistive device to ambulate." *Id.*

Turning to Plaintiff's depression, the ALJ found that the evidence failed to establish severe impairment. *Id.* The ALJ noted that Plaintiff had not been treated by a psychiatrist or psychologist, and was consistently documented as being alert and oriented. *Id.* The ALJ noted, however, that Plaintiff's primary care physician, Dr. Tyndall, completed a mental impairment examination concluding that Plaintiff had a limitation on his social functioning that would preclude his employment. *Id.* The ALJ found Dr. Tyndall's assessment to lack credibility, however, as it appeared to him that the opinion was merely conclusive in nature, and unsupported by the weight of the evidence. *Id.* The ALJ noted that Dr. Tyndall did not

17

administer any psychological testing, and based the findings solely on Plaintiff's self-reporting. *Id.* Additionally, the ALJ credited Dr. Brustein's assessment of Plaintiff's mental conditions, and his conclusion that Plaintiff was capable of understanding directions and had an adequate memory. *Id.* Furthermore, in accord with the Remand Order, the ALJ considered opinions of the State Agency psychiatrists, Dr. Shapiro and Dr. Flaherty, who both concluded that Plaintiff's depression was a severe impairment, but that Plaintiff retained the mental ability to understand, remember, and follow instructions. A.R. 17.

Furthermore, the ALJ noted that both doctors found that Plaintiff could complete routine tasks in a lower stress setting with minimal interpersonal contact. *Id.* Based upon the evidence, the ALJ concluded that Plaintiff's depression was not a severe impairment, as it did not result in a restriction of the activities of daily living. *Id.*

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments under the SSA that would qualify for disability benefits. *Id.* The ALJ found that, although Plaintiff suffered from diabetes, he did not have neuropathy demonstrated by significant disorganization of motor function in two extremities. *Id.* The ALJ considered Plaintiff's asthma, obesity, and diabetes and concluded that the combination of these conditions "does not meet or equal the criteria of any of the listed impairments." *Id.*

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work under the SSA, except that, "due to pain and the side effects of his medications he is limited to simple and repetitive work with no fine fingering in right hand in pinkey [sic] and ring finger, frequent fine fingering with the left hand, deafness in the right ear, other ear normal, and due to his asthma, he should avoid temperature extremes and, [sic] pulmonary irritant. He

18

should be allowed to alternate between sitting and standing." A.R. 18. In reaching this conclusion, the ALJ made a two-step inquiry. First, the ALJ sought to determine whether there was an underlying, medically determinable impairment, which could reasonably be expected to produce Plaintiff's pain or other symptoms. *Id.* Second, if the ALJ found an impairment, he would next determine the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit Plaintiff's functioning. *Id.*

The ALJ began with a recitation of Plaintiff's complaints and symptoms, including frequent urination, dry mouth, neuropathy in his right foot, lower back pain, blurry vision, asthma, deafness in his right ear, sleep apnea, diabetes, and obesity. *Id.* Upon consideration, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." A.R. 19. Specifically, the ALJ found that Plaintiff's "blood sugar levels have not always been under adequately [sic] control but with the regular use of prescribed medication these levels are stable." *Id.* As to Plaintiff's complaints of back and leg pain, the ALJ found that despite the pain, Plaintiff noted "weed whacking, doing push-ups at home, and running." *Id.* Furthermore, the ALJ reviewed notes from RWJ indicating that Plaintiff missed many of his scheduled physical therapy sessions. *Id.*

Turning next to the limitations and effects of Plaintiffs symptoms, the ALJ noted Dr. Villanobos' RFC assessment of Plaintiff, in which the doctor opined that Plaintiff was capable of performing light work activity. A.R. 20. In accord with the Remand Order, the ALJ reviewed additional evidence of Plaintiff's impairments, including a stress test and hospital records regarding two injections Plaintiff received for back pain. *Id.* The ALJ addressed Plaintiff's

contention that he cannot work, but found that limitation to be self-imposed. *Id.* The ALJ noted Plaintiff's ability to take care of his children, run errands, run, do push-ups, perform chores around the house, cook, shop, and attend church. *Id.*

Furthermore, the ALJ reviewed the testimony given at the hearing by Plaintiff's fiancée, Amanda McDaniel, and found it to not be credible, and therefore, accorded it little weight. *Id.* Ultimately, the ALJ found that "[a]lthough the assertions of pain and symptoms are reasonable to a degree, the overall record does not support them to the debilitating extent asserted." A.R. 21. The ALJ found that Plaintiff is, in fact, limited in his ability to perform strenuous exertional activity, but that this limitation does not preclude non-strenuous activity. *Id.* The ALJ concludes, "the claimant has the capacity to function adequately to perform many basic activities associated with work." *Id.*

Ultimately, the ALJ found that Plaintiff had a limited capacity for strenuous employment, but Plaintiff had been capable, at all relevant times, of performing work that involves lifting and carrying objects weighing up to ten pounds, standing and walking for two hours in an eight-hour workday, and sitting up to six hours during an eight-hour workday. *Id.* Furthermore, the ALJ found that Plaintiff was limited to simple and repetitive work with no fine fingering in the right hand and frequent fine fingering with the left hand. *Id.* The ALJ also concluded that, due to his asthma, Plaintiff should avoid temperature extremes and pulmonary irritants. *Id.* In so concluding, the ALJ accorded little weight to the opinions of Dr. Tyndall and Dr. Hester as he found their opinions to be inconsistent with the record, and gave great weight to the State Agency medical consultants who opined that Plaintiff had a residual functional capacity for light work. A.R. 22.

Fifth, the ALJ found that Plaintiff was unable to perform any past relevant work. A.R. 23.

The ALJ nonetheless concluded that, considering the "claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." A.R. 23. The ALJ based this conclusion on the testimony of vocational expert Pat Green, who opined that someone with Plaintiff's age, education, work experience, and residual functional capacity, could perform the requirements of an Auto Clerk (DOT # 209.567–014), Toy Stuffer (DOT # 731.685–014), and Sorter (DOT # 521.687–086). *Id.* Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined in the SSA, from April 30, 2010 through January 10, 2014, the date of the decision. A.R. 24.

## II.      Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as

adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not

"empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is

contrary evidence in the record that would justify the opposite conclusion, the Commissioner's

decision will be upheld if the evidence supports it. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d

Cir. 1986).

### III.        Standard for Entitlement to Benefits

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the

statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §

423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical

or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A). Eligibility for supplemental security income requires the same showing of

disability. *Id*. § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine

whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether

the claimant has shown that he is not currently engaged in "substantial gainful activity." *Id.* §

404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently

engaged in any form of substantial gainful activity, he is automatically denied disability

benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ

determines whether the claimant has demonstrated a "severe impairment" or "combination of

impairments" that significantly limits his physical or mental ability to do basic work

activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are

defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).

These activities include physical functions such as "walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying or handling." *Id*. A claimant who does not have a severe impairment

is not considered disabled. *Id*. § 404.1520(c); *see Plummer*, 186 F.3d at 428.

 Third, if the impairment is found to be severe, the ALJ then determines whether the

impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1

(the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or

her impairments are equal in severity to, or meet those on the Impairment List, the claimant has

satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. §

404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n. 5. If the specific impairment is not listed,

the ALJ will consider in his or her decision the impairment that most closely satisfies those listed

for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. §

404.1526(a). If there is more than one impairment, the ALJ then must consider whether the

combination of impairments is equal to any listed impairment. *Id*. An impairment or combination

of impairments is basically equivalent to a listed impairment if there are medical findings equal

in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

 If the claimant is not conclusively disabled under the criteria set forth in the Impairment

List, step three is not satisfied, and the claimant must prove at step four whether he retains the

residual functional capacity to perform his or her past relevant work. 20 C.F.R. §

404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146– 47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

**IV.     Plaintiff's Claims on Appeal[2]**

### a.   Failure to Properly Evaluate the Evidence

#### i. Step Two Evaluation

At Step Two, Plaintiff argues that the ALJ did not properly evaluate the evidence in failing to find that Plaintiff's asthma, sleep apnea, and depression constituted severe impairments. Pl.'s Br. at 10–11. More specifically, Plaintiff questions why his sleep apnea and asthma were considered severe impairments in the first hearing, but were found not to be in the second. *Id.* at 11. In response, Defendant argues that the ALJ properly evaluated Plaintiff's asthma, sleep apnea, and depression as not severe, and alternatively, avers that Plaintiff's

---

[2] In addition to the arguments discussed below, Plaintiff questions why he "testified before Judge O'Leary but had [the] decision signed by Judge West," on Judge O'Leary's behalf. Pl.'s Reply Br. at ¶6; *see also* Pl.'s Br. at 2, 21. However, Plaintiff does not offer substantive legal argument on the topic. Not provided with a substantive legal argument, and as the Court finds that this does not affect the outcome of this matter, the issue will not be discussed further.

argument on this point is inconsequential, as the ALJ found severe impairments at Step Two, and continued through the Step Five analysis. Def.'s Br. at 7.

Plaintiff has the initial burden of demonstrating that he has a severe impairment. *Bowen*, 482 U.S. at 146; 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). A severe impairment must "limit significantly the claimant's ability to perform most jobs." *Bowen*, 482 U.S. at 146; *see also* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

"The step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.* (citing S.S.R. 85–28, 1985 SSR LEXIS 19). However, a determination that a claimant's request should be denied at Step Two "should be reviewed with close scrutiny." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

Plaintiff's asthmatic condition has been well documented throughout the record. Plaintiff testified about his repeated visitation to the emergency room for his asthma, and the record clearly supports Plaintiff's contention that he visited RWJ Emergency Room on several occasions presenting with shortness of breath. *Id.* Dr. Tyndall however, who was treating Plaintiff for his asthma, noted that Plaintiff was using an inhaler 4–5 times per week, although the doctor was "unsure if it is asthma vs anxiety symptoms." A.R. 365. Plaintiff testified about his use of a nebulizer, and his taking of the medications ProAir, Ventolin, and Serevent for his

asthma. A.R. 42. The record indicates the Plaintiff was inconsistent in his use of the prescriptions; specifically, Plaintiff noted that he was not taking the Advair or Flovent. A.R. 603. During the same visit that Plaintiff admitted to not using his medication and complaining of increased asthmatic complications, Plaintiff informed his doctor that he was walking around the block three times per day. *Id.* Furthermore, Plaintiff informed Dr. Tyndall that he powerwalked over an hour per day and exercised 30 minutes, five times per week. A.R. 370. In total, the ALJ's finding that Plaintiff's asthma was not a severe impairment is sufficiently supported by the medical evidence.

Second, Plaintiff argues that his sleep apnea should be considered a severe impairment. The Administrative Record indicates that Plaintiff did in fact undergo a sleep study, the results of which showed a presence of moderately severe sleep-disordered breathing. A.R. 637. Plaintiff received a CPAP machine, but claimed that he remained unable to sleep through the night. A.R. 44. No other medical evidence is provided regarding Plaintiff's sleep apnea and whether the CPAP has alleviated that condition, or how it affects his ability to work. As such, the ALJ's finding that Plaintiff failed to meet his burden in proving that his sleep apnea was a severe impairment is sufficiently supported by the medical evidence.

Additionally, Plaintiff makes two arguments regarding the State Agency evaluation conducted by Dr. Shapiro, and reviewed by Dr. Flaherty. First, Plaintiff argues that the ALJ did not consider Dr. Shapiro and Dr. Flaherty's opinions. Pl.'s Br. at 24. Second, Plaintiff argues that the medical evidence does not support the conclusions drawn by Dr. Shapiro and Dr. Flaherty. *Id.* Having reviewed the ALJ's decision, it is clear that he considered the reports of both Dr. Shapiro and Dr. Flaherty. While the ALJ's discussion of the these reports is brief, the ALJ did consider Dr. Shapiro and Dr. Flaherty's reports in light of the evidence, and found them to be not

credible, as Plaintiff had no restrictions of activities of daily living, and only mild difficulty in social functioning, and maintaining concentration, persistence or pace. A.R. 17. I note that Dr. Flaherty's report, as it appears in the record, is primarily an affirmation of Dr. Shapiro's findings, and therefore, provides only a small amount of additional information for consideration. *See* A.R. 615. Because the ALJ looked at the evidence, and referred to contrary material contained in the record—specifically, multiple determinations that Plaintiff's psychological state does not severely impact his ability to work—I find that there is support in the record for the ALJ's determination, and therefore, find no basis to overturn this finding.

Furthermore, Plaintiff questions why the ALJ altered his Step Two determination from the first opinion.[3]  A.R. 11, 15–18. The Court is not reviewing prior opinions, but rather only the ALJ opinion currently on appeal. As such, this argument will not be discussed further.

Lastly, Plaintiff argues that his depression should have been considered a severe impairment. The Administrative Record contains ample evidence of Plaintiff's psychological situation. Plaintiff's primary care physician, Dr. Tyndall, diagnosed him with "depression [and] anxiety," A.R. 374, and opined that Plaintiff had a poor ability to do work related activities. A.R. 377. Dr. Brustein, Psy.D., also determined that Plaintiff suffered from a Major Depressive Disorder but concluded that he "can understand directions, has adequate recent and remote memory, with mild impairment in working memory and persistence. Sustained concentration is also mildly impaired. Socially he has difficulty interacting with others and is prone to irritability and outbursts." A.R. 421. Dr. Flaherty, a State Agency Physiatrist, examined Plaintiff and also found that he "appears to be depressed. . ." A.R. 459. Dr. Flaherty opined further that Plaintiff

---

[3] Plaintiff argues that, because of the failures at Step Two, severe impairments are not accounted for in the subsequent steps. *See* A.R. 14. Because I find the ALJ's Step Two analysis to be supported by the evidence, I need not address this argument further.

"was cooperative, alert & oriented. He had logical, organized thought process and speech. His insight was good, and he knows from where his depression stems; judgment is adequate." *Id.* Ultimately, Dr. Flaherty concluded that Plaintiff "retains the mental ability to understand, remember and follow instructions and complete routine tasks in a lower stress setting with minimal interpersonal contact." *Id.* On reconsideration of Dr. Flaherty's assessment, Dr. Shapiro affirmed the findings from the initial report. A.R. 615. Based upon this evidence, Plaintiff has not met his burden of proving that this impairment significantly limited his ability to perform most jobs. *See Bowen*, 482 U.S. at 146; *see also* 20 C.F.R. § 404.1521a ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). Therefore, the ALJ's finding that Plaintiff's depression was not a severe impairment is sufficiently supported by the medical evidence.

ii.   **Step Four**

The Step Four inquiry considers whether Plaintiff retains the residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428.

At Step Four, Plaintiff argues that the RFC assessment is incomplete because the ALJ did not properly evaluate all of the Step Two severe impairments, including obesity, asthma, sleep apnea, and psychiatric disorders. Pl.'s Br. at 18. Defendant responds that Plaintiff's argument is inconsequential as the ALJ analyzed all of the impairments, including those found to not be severe, at Steps Three, Four, and Five. Def.'s Br. at 14.

Plaintiff's arguments regarding the ALJ's Step Four analysis are moot as the ALJ explicitly found that "[t]he claimant is unable to perform any past relevant work." A.R. 23. As is well settled,

> [I]f it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

*Goldberg v. Colvin*, 2015 U.S. Dist. LEXIS 31012, *23–24 (D.N.J. Mar. 13, 2015).

Additionally, Plaintiff argues that the ALJ's opinion is deficient because discrepancies exist between the Step Two and Step Four findings.  Pl.'s Br. at 20. Specifically, Plaintiff argues that impairments found not to be severe in Step Two, are then considered in conducting the Step Four analysis. *Id.* It is settled, however, that if the ALJ fulfills the analytical obligation under Step Four, that any error at Step Two will likely be harmless. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552–53 (3d Cir. 2005)); *Lombardi v. Astrue*, 2009 U.S. Dist. LEXIS 89914, *30–31, 2009 WL 3229763 (D.N.J. Sept. 29, 2009). Finding that the ALJ adequately conducted the Step Four analysis, the Court rejects Plaintiff's arguments.

The Court will continue with a discussion of the ALJ's Step Five analysis.

### iii.   Step Five Analysis

### 1.   RFC Assessment

Plaintiff cites both *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981) and *Burnett v. Comm'r of SSA*, 220 F.3d 112, 121 (3d Cir. 2000) for the proposition that the ALJ must consider and explain the reasons for discounting evidence in making his residual functional capacity

determination. Pl.'s Br. at 24–26. Specifically, Plaintiff argues that that the ALJ's RFC assessment is deficient, as it does not recite the specific evidence considered, is vague, and is unsupported by the evidence. Pl.'s Br. at 18–19. Plaintiff objects to the ALJ's decision not to recognize psychiatric and other restrictions in creating the assessment, and further argues that the ALJ failed to follow the Remand Order directing him to specify the degree to which Plaintiff must avoid environmental conditions affecting his asthma. Pl.'s Br. at 18. Defendant responds that the ALJ correctly analyzed all of Plaintiff's impairments—severe and not—in assessing Plaintiff's RFC. Def.'s Br. at 15.

"In making a residual functional capacity determination, the ALJ must consider all evidence before him," and must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Ultimately, "[w]here the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (2012). When looking at the medical testimony, an ALJ must give a treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2). The ALJ may also consider other factors, such as the "amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has." 20 C.F.R. § 404.1527(c)(6). If, however, a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating physician's

30

opinion, rather than "credibility judgments, speculation or lay opinion." *Id.*

As to Plaintiff's first argument, that the ALJ did not consider or include Plaintiff's psychiatric or other impairments in rendering the RFC, the Court finds that the ALJ adequately considered Plaintiff's psychiatric condition. By Plaintiff's own account, and as fully supported by the record, the ALJ did in fact consider all impairments—severe and not—in creating the RFC. See Pl.'s Br. at 20 (articulating that the ALJ considered impairments found non-severe at Step Two in conducting the RFC analysis).

Ultimately, the ALJ concluded that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" as the "objective medical evidence fails to support the claimant's allegations of complete disability." A.R. 19.

The ALJ discussed Plaintiff's diabetes, noting that the claimed symptoms included dry mouth and frequent urination. A.R. 18. The ALJ noted Plaintiff's medical history of elevated blood sugar levels, and acknowledged that Plaintiff had been treated for this condition. A.R. 19. That said, the ALJ also found, based upon Plaintiff's own reports to his physicians, that Plaintiff had not consistently used the medications prescribed to him. *See Id;* A.R. 603. Furthermore, the ALJ found that there was no evidence of "end-organ damage, emergency room visits, [or] inpatient hospital treatment of an intensive course of care due to diabetes-related complications." A.R. 19.

Dr. Villanobos, Plaintiff's treating endocrinologist, agreed that Plaintiff suffered from elevated blood sugar levels, but also noted that Plaintiff failed to follow instructions regarding checking his blood sugar and taking his medications. A.R. 387. Furthermore, Dr. Villanobos

completed an assessment of Plaintiff's ability to complete work-related activities, and found that although limited, he could complete light work-related activities, including sitting without limitation, standing and walking for up to two hours per day, and lifting 20 pounds. A.R. 385.

The ALJ also considered Plaintiff's diagnoses of mild peripheral neuropathy likely stemming from his diabetic condition. A.R. 20. The ALJ concluded that "there is no evidence of neuropathy in the upper extremities and there is no evidence of motor deficits of sensory loss in the upper or lower extremities." *Id.* The ALJ noted that Plaintiff "walks independently with a normal gait." *Id.* In support of this, the ALJ referenced Plaintiff's primary care physician—Dr. Tyndall's—notes which include Plaintiff's report that he power walks for 1-1 ½ hours per day and he exercises for 30 minutes a day. A.R. 20 (citing A.R. 370).

When looking at the medical testimony, an ALJ must give a treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2). If, however, a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ must rely only on "contradictory medical evidence" in rejecting the treating physician's opinion, and here, the ALJ has satisfied this requirement.

As to the psychiatric deficiency allegations, the ALJ found that the "claimant has not been treated by a psychiatrist or psychologist and there is no history of any formal psychiatric treatment." A.R. 20. Notwithstanding this comment, the record shows that Dr. Tyndall found Plaintiff to suffer from depression and anxiety, and prescribed Xanax. A.R. 367. The ALJ, however, gave little weight to Dr. Tyndall's finding though, as he finds it "contrary to the

32

objective medical evidence and the treatment notes as a whole." A.R. 22. Instead, the ALJ gives great weight to the State Agency medical consultants, who assessed Plaintiff as having an RFC for light work. Dr. Flaherty determined that Plaintiff suffered from Affective Disorders, but concluded that none of those symptoms result in a degree of limitation that satisfies the functional criterion. A.R. 453, 446, 457–59. Specifically, Dr. Flaherty found that Plaintiff "retains the mental ability to understand, remember and follow instructions and complete routine tasks in a lower stress setting with minimal interpersonal contact." A.R. 459. Furthermore, Dr. Brustein examined Plaintiff on October 23, 2010 and evaluated Plaintiff in accord with the DSM, concluding that Plaintiff suffered from a Major Depressive Disorder and Panic Attack Disorder. A.R. 420–21. Ultimately, Dr. Brustein found that Plaintiff has an adequate recent memory, can understand directions, and has only mildly impaired concentration. A.R. 421.

The ALJ also gave "careful consideration . . . to claimant's subjective complaints" and found that they "are not supported by the objective evidence." A.R. 20. Indeed, Dr. Jacknin evaluated Plaintiff for the purposes of completing a Physical RFC Assessment, and concluded that Plaintiff can occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry 25 pounds, sit and/or stand for about six hours in an eight-hour workday, and is limited in lower extremity usage due to mild neuropathy. A.R. 391.

On the other hand, Dr. Hester examined Plaintiff on May 26, 2011 and concluded that he could not work. A.R. 619–20. Dr. Hester determined that the disability would last for more than 12 months. A.R. 620. Similarly, Dr. Kaufman found that Plaintiff suffered from asthma, diabetes, anxiety, neuropathy of the foot and legs, and sleep apnea. A.R. 648. Based upon these findings, Dr. Kaufman concluded that Plaintiff was unable to work for at least 12 months. *Id.*

33

The ALJ ultimately found that Plaintiff has the "residual functional capacity to perform work that involving lifting and carrying objects weighing up to 10 pounds; standing and walking for 2 hours in an 8-hour workday; and sitting up to six hours in an eight-hour day." A.R. 21. Additionally, "he is limited to simple and repetitive work with no fine fingering in right hand in pinkey [sic] and ring finger, frequent fine fingering with the left hand, deafness in the right ear, other ear normal, and due to his asthma, he should avoid temperature extremes and, [sic] pulmonary irritants." A.R. 21. This conclusion is consistent with Dr. Villanobos' assessment, is more restrictive then Dr. Jacknin's assessment, and has support in the evidence. Because the ALJ's findings of fact are supported by substantial evidence, the Court is bound by those findings.

### 2.        Commissioner's Burden as to Step Five

Plaintiff further argues that the Commissioner did not bear the burden of proof at Step Five. Pl.'s Br. at 27–30. Plaintiff focuses much of his brief on the argument that the ALJ presented the vocational expert with a hypothetical that did not reflect Plaintiff's impairments as supported by the record, thereby resulting in his denial of benefits. *Id.* In other words, Plaintiff argues that the ALJ failed to accurately convey the RFC to the vocational expert, and therefore, the expert's testimony is unreliable. Defendant counters that the ALJ's Step Five analysis was proper, and that the hypothetical posed to the vocational expert adequately reflects Plaintiff's age, education, work experience, and RFC. Def.'s Br. at 17.

At Step Five, it is the Commissioner's burden to prove that there are jobs in the national economy that the Plaintiff can perform, given the impairments accepted by the ALJ. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). If work a claimant can do "exists in the national economy"—that is, if "there is a significant number of jobs (in one or more occupations) having

requirements which [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications"—the claimant will not be considered disabled. 20 C.F.R. § 404.1566(b); *see also Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (holding that 200 jobs in regional economy "is a clear indication that there exists in the national economy other substantial gainful work which [claimant] can perform."). According to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P., app'x 2 (hereinafter "the guidelines" or "the grids"), where a claimant has both strength and nonexertional limitations, the rules listed in that appendix may be used "in determining first whether a finding of disabled may be possible based on the strength limitations alone." *Id.* at ¶ 200.00(e)(2). If no such finding is possible, then "the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." *Id.* However, "the grids cannot automatically establish that there are jobs in the national economy when a claimant has severe exertional and nonexertional impairments." *Sykes*, 228 F.3d at 267. In that case, an ALJ must take additional evidence to determine the effect of a nonexertional limitation on residual functional capacity. *Id.* at 270.

The taking of additional evidence to determine residual functional capacity is preferably done through the testimony of a vocational expert. *Jesarum v. Sec'y of U.S. Dep't of Health and Human Servs.*, 48 F.3d 114, 121 (3d Cir. 1995). Such testimony "'typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ . . . . [W]hether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy.'" *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d. Cir. 2005) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.

35

1984). The vocational expert's testimony, however, "'may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" *Id.* at 554 (quoting *Podedworny*, 745 F.2d at 218). That is, "the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Id.* "Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Id.* On the other hand, if an ALJ has appropriately rejected a limitation, that limitation need not be conveyed to the vocational expert. *See id.*; *Russo v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 170589, *29–31 (D.N.J. Dec. 10, 2014).

On remand, the ALJ properly called a vocational expert to testify as to the types of jobs Plaintiff could perform, and the extent to which such jobs exist in the local and national economy. The ALJ asked the vocational expert to assume someone of the Plaintiff's age, education, and work history. A.R. 51. Further, the ALJ asked the expert to assume that said person was restricted to sedentary work, and was restricted to jobs that do not require fine fingering in the pinkie and ring finger of the right hand. *Id.* The ALJ then asked the expert to assume that the "individual cannot work in an environment with undue concentrations of dust, smoke, fumes, or other pulmonary irritants or extremes of temperatures." A.R. 52. The ALJ asked the expert to assume that this individual was limited to simple, repetitive jobs—in other words, unskilled work—due to Plaintiff's pain and medication. *Id.* Next, the ALJ asked the expert to assume deafness in one ear. *Id.* Lastly, the expert was asked to assume that the individual would need to work in an environment allowing them to alternate between sitting and standing. A.R. 53.

Based upon the hypothetical presented, the expert opined that the individual could work as an Order Clerk, DOT # 209.567–014, with an SVP of 2, which is an unskilled and sedentary job. A.R. 52. The expert noted that there are 2,000 jobs in the region and 45,000 in the national economy. *Id.* Furthermore, the expert found that the individual could work as a Toy Stuffer, DOT # 731.685–014, with an SVP of 2, which is an unskilled and sedentary job. A.R. 53. The expert noted that there are 2,350 jobs in the region and 345,000 in the national economy. A.R. 53. The existence of 200 jobs in a regional economy has sufficed to show that "other substantial gainful work" exists, and prevented a finding of disability. *See Craigie*, 835 F.2d at 58.

However, Plaintiff argues that the RFC provided to the vocational expert differed from the one articulated in the opinion. Pl.'s Br. at 19. Specifically, Plaintiff argues that Step Two deficiencies plagued the Step Four, RFC analysis, which subsequently affected the Step Five questioning of the vocational expert. *Id.* Having reviewed the ALJ's communication of the RFC to the vocational expert, I find that it was complete, and similarly conclude that the ALJ appropriately evaluated the intensity and persistence of Plaintiff's subjective symptoms, based on the medical evidence. While the ALJ uses different language then was used in the written opinion[4] in communicating the RFC to the vocational expert, this alteration has no material impact on the outcome of this case.

**V.      Conclusion**

---

[4] Plaintiff takes issue with the ALJ's finding that Plaintiff should avoid "temperature extremes and pulmonary irritants" in the written RFC but informed the vocational expert that Plaintiff need only avoid "undue concentrations" of irritants in the testimonial hearing. Pl.'s Br. at 29. Although the term of degree may be slightly different, the overall conclusion remains constant, and the Court finds no issue with the ALJ's choice of terminology. As the 10th Circuit held in *Talamantes v. Astrue*, a minor discrepancy in langue does not undermine the overarching outcome of the case. 370 F. App'x 955, 959 (10th Cir. 2010). *See also Struna v. Astrue*, No. 11–1515, 2012 WL 3127411, at *8 (M.D. Fla. July 16, 2012) (finding differences in semantics to be mere distraction as opposed to a substantive concern).

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

Date: July 22, 2015

                                      \_\_/s/ Freda L. Wolfson_____

                                       Hon. Freda L. Wolfson, U.S.D.J.